UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

NICOLE RUSSO,

                              Plaintiff,

              v.                                          1:12-CV-1616
                                                         (FJS/CFH)

COUNTY OF WARREN, RICHARD T.
GRAHAM, BRYAN RAINVILLE,
THOMAS HASKELL, ROY MIHILL, and
SERGEANT CHRISTOPHER WEBSTER,

                              Defendants.

COUNTY OF WARREN, RICHARD T.
GRAHAM, BRYAN RAINVILLE,
THOMAS HASKELL, ROY MIHILL, and
SERGEANT CHRISTOPHER WEBSTER,

                              Third-Party Plaintiffs,

UNITED STATES OF AMERICA and
DEPARTMENT OF HEALTH AND
HUMAN SERVICES,

                              Third-Party Defendants.
_____

APPEARANCES                          OF COUNSEL

D'ORAZIO PETERSON, LLP               GIOVANNA A. D'ORAZIO, ESQ.
125 High Rock Avenue                 SCOTT M. PETERSON, ESQ.
Saratoga Springs, New York 12866
Attorneys for Plaintiff

**LEMIRE, JOHNSON & HIGGINS, LLC**　　　　**GREGG T. JOHNSON, ESQ.**
2534 Route 9, P.O. Box 2485　　　　　　　　　**APRIL J. LAWS, ESQ.**
Malta, New York 12020
Attorneys for Defendants and
Third-Party Plaintiffs

**OFFICE OF THE UNITED**　　　　　　　　　**KAREN F. LESPERANCE, AUSA**
**STATES ATTORNEY**
James T. Foley Courthouse
445 Broadway, Room 218
Albany, New York 12207
Attorneys for Third-Party Defendants

**SCULLIN, Senior Judge**

## MEMORANDUM-DECISION AND ORDER

## I.  INTRODUCTION

Plaintiff Nicole Russo brings this case against Defendant County of Warren and Defendants Richard T. Graham, Bryan Rainville, Thomas Haskell, Roy Mihill, and Sergeant Christopher Webster ("CO Defendants"), all of whom were employed as corrections officers at Warren County Correctional Facility ("the Facility") at the times in question.  Plaintiff alleges eight causes of action in her second amended complaint.  *See generally* Dkt. No. 19, Second Amended Complaint.  Four of these are federal claims under 42 U.S.C. § 1983, to wit (1) against the CO Defendants for use of excessive force in violation of the Eighth Amendment, (2) against the CO Defendants for denial of medical treatment in violation of the Eighth Amendment, (3) against the CO Defendants for conditions of confinement violating the Eighth Amendment, and (4) against Defendant County of Warren for an unconstitutional custom or practice which caused a violation of her constitutional rights.  Plaintiff also asserts four pendent state-law claims, to wit (1) assault and battery against the CO Defendants, (2) intentional infliction of emotional distress

against all Defendants, (3) vicarious liability against Defendant County of Warren, and (4) negligence against Defendant County of Warren.

Defendants, in turn, filed a third-party complaint against the United States and the U.S. Department of Health and Human Services for indemnification or, in the alternative, contribution.

## II. BACKGROUND

In June of 2011, Plaintiff was incarcerated at the Facility for approximately five days. Plaintiff's eight causes of action against Defendants arise from events which took place during this interval.

## A. Events giving rise to Plaintiff's claims

On the first day of Plaintiff's incarceration, she was processed without incident and assigned a cell. *See* Dkt. No. 68-25, Defs.' Statement of Material Facts, at ¶¶ 6-7. It is undisputed that Plaintiff failed to disclose that she had recently undergone an abortion and had been experiencing vaginal bleeding. *See id.* at ¶¶ 8-11. During processing, Plaintiff turned over her prescription medication, which was "sent to medical." *See* Dkt. No. 68-3, Defs.' Ex. "B", at 6. She was issued bedding and other basic items and then proceeded to her cell, where she slept for much of the next twenty-four hours. *See* Dkt. No. 68-25, Defs.' Statement of Material Facts, at ¶ 31.

### 1. *Transfer between cells*

The parties are less in agreement as to the events of the second day.  Plaintiff awoke on Friday afternoon to find that she was bleeding from her vagina and that the blood had soaked into her jumpsuit.  *See* Dkt. No. 68-25, Defs.' Statement of Material Facts, at ¶ 32.  Plaintiff testified at her deposition that she called out to Defendant CO Graham that she was in need of medical attention.  *See* Dkt. No. 71-1, Plaintiff's 50-h Deposition, at 61:12-22.  She further testified that he provided her with a medical request form but that he refused to provide her a pen with which to fill it out.  *See id.* at 64:10-14.  Lacking a pen with which to complete the form, Plaintiff testified that she shouted, "What am I supposed to f'ing do, write this in f'ing blood?" *See id.* at 64:15-22.  According to Defendants, Plaintiff was aggressive, disruptive, and belligerent from the time she woke up.  In response to this exchange with Defendant CO Graham, it was determined that Plaintiff be transferred to housing unit "Linear A."  *See* Dkt. No. 68-19, Affidavit of Defendant Richard Graham, at ¶ 7.

During the transfer, Defendants maintain that they followed proper procedure, took precautions for Plaintiff's safety, and used no greater force than necessary.  *See, e.g.*, Dkt. No. 68-18, Aff. of Def. Sgt. Webster, at ¶¶ 4-5; Dkt. No. 68-25, Defs.' Statement of Material Facts, at ¶¶ 53-68.  Plaintiff, on the other hand, alleges that, as a result of the Defendant COs' behavior, she suffered a chipped tooth, a laceration on the side of her torso, and lacerations and bruising on her wrists.  *See* Dkt. No. 71-2, Pl.'s 50-h Dep., at 40:17-41:7, 53:10-23.  Plaintiff testified that, during the transfer, she did not resist and that she told Defendant COs many times that she was not resisting.  *See, e.g.*, *id.* at 3:13-14.

The Facility's security cameras recorded most of Plaintiff's transfer to Linear A. Defendants present this footage to the Court in three segments.  *See* Dkt. No. 69, Defs.' Ex. "A".

Notably, the video includes footage only of Defendants guiding Plaintiff into and through the Facility's corridors. It does not show anything that took place within either cell. However, Plaintiff alleges that the bulk of her injuries, namely, the chipped tooth, the laceration on her side, and part of the damage to her wrists, took place inside the Linear A cell at the end of the transfer. *See* Dkt. No. 19, Second Am. Compl., at ¶¶ 37-38.

In the first video segment, a CO approaches Plaintiff's cell, slides a sheet of paper under the door, and returns to his post. *See* Dkt. No. 69, Defs.' Ex. "A", at 15:14:00-15:14:42 (A Pod view). A few minutes later, all the prisoners in the common areas near Plaintiff's cell return to their own cells. *See id.* at 15:20:00-15:20:35. Four male COs then approach Plaintiff's cell and enter it. *See id.* at 15:21:30-15:22:04. Approximately fourteen seconds later, Plaintiff is first seen exiting her cell with Defendant COs guiding her from behind. *See id.* at 15:22:18. She descends the stairs and crosses the common area on the floor below, and at this time the fifth Defendant CO joins them. *See id.* at 15:22:24-15:22:50. At this point there is one CO touching Plaintiff's arm. *See id.* According to Plaintiff, at this time Defendant COs began twisting her handcuffs because they perceived her to be resisting when she stumbled over her jumpsuit at the bottom of the stairs. *See* Dkt. No. 71-2, Pl.'s Ex. "A", at 4:19-5:17.

In the second segment, Defendant COs guide Plaintiff through the Facility's corridors. At one point, Plaintiff drops to her knees for approximately thirteen seconds. *See* Dkt. No. 69, Defs.' Ex. "A", at 15:23:34-15:23:48 (Main and Off Hall view). Plaintiff testified that she was forced to the floor in pain because one of Defendant COs applied a great force upon her handcuffs. *See* Dkt. No. 71-2, Pl.'s 50-h Dep., at 18:16-19:11. Indeed, Plaintiff maintains that she was in severe and increasing pain for the duration of the transfer due to Defendant COs' application of force in twisting her handcuffs. *See id.* at 10:3-12. She further testified that she

laid on the floor sobbing before Defendant COs pulled her up to her feet and resumed the transfer. *See id.* at 19:5-11. The video does not show Plaintiff lying on the floor, however due to the lack of sound on the video, it is impossible to confirm or deny whether Plaintiff is sobbing, crying out in pain, or telling Defendant COs that she is not resisting.

The third and final video segment, showing the corridor outside Plaintiff's Linear A cell, is most telling. At time 15:24:53, Defendant COs guide Plaintiff through a metal door into what appears to be her new cell. *See* Dkt. No. 69, Defs.' Ex. "A", at 15:24:53 (Linear Hallway view). Twenty seconds later, one of Defendant COs is seen removing a mattress from the cell. *See id.* at 15:25:13. Immediately thereafter, the same CO is seen hurrying back into the cell. *See id.* at 15:25:20-15:25:22. Defendant COs emerge from the cell all together at 15:27:25, two minutes and thirty-three seconds after Plaintiff and Defendant COs entered the cell. As mentioned, Plaintiff alleges that the majority of the events giving rise to her excessive force claims took place during this interval. Yet there is no video footage capturing what happened.

With respect to Plaintiff's original cell, placing Plaintiff in handcuffs and removing her from the cell took approximately fourteen seconds. *See* Dkt. No. 69, Defs.' Ex. "A", at 15:22:04-15:22:18 (A Pod view). During this time, according to Plaintiff, the following events took place out of the cameras' view. Defendant COs lifted her to her feet by pulling up on her handcuffs, causing her pain and contributing to her wrist injuries. *See* Dkt. No. 71-2, Pl.'s 50-h Dep., at 1:2-5, 4:12-18. At this point, Plaintiff testified, she began telling Defendant COs that she was not resisting and that they need not use so much force with her. *See id.* at 5:15-17 ("I have to have said it at least 20 or 30 times that I was not resisting."). She did, however, also testify that she was squirming in an attempt to lessen the pressure on her wrists. *See id.* at 4:13-15.

With respect to the destination cell at Linear A, Plaintiff alleges that, after being pushed to the floor, her face was smashed into the floor such that she suffered a chipped tooth. *See* Dkt. No. 71-2, Pl.'s 50-h Dep., at 40:20-23. She further testified that one of Defendant COs kicked her in the side, resulting in a laceration. *See id.* at 41:2-7. Finally, Plaintiff testified that, while she was being held face-to-the-floor in the Linear A cell, Defendant Sgt. Webster stepped on her back and pulled her arms up by the handcuffs, causing further damage to her wrists. *See* Dkt. No. 71-3. Pl.'s Dep., at 76. In support of these allegations, Plaintiff has produced photographs of her wrists and of her torso which show bruising, scabs, and scarring. *See* Dkt. No. 68-13, Defs.' Ex. "O."

The Facility's Inspection and Supervision policy in place during the time at issue required a female CO to be present at any time when force is used against a female inmate. *See* Dkt. No. 68-15, Defs.' Ex. "N", at 17. The CO Defendants, apparently excluding Sgt. Webster, testified that they were not aware of this policy. *See* Dkt. No. 71-7, Thomas Haskell Dep., at 19:5-17; Dkt. No. 71-9, Brian Rainville Dep., at 22:10-13; Dkt. No. 71-6, Richard Graham Dep., at 13:20-24; Dkt. No. 71-8, Roy Mihill Dep., at 14:25-15:3. It is undisputed that no female officer was present during Plaintiff's transfer. *See generally* Dkt. No. 69, Defs.' Ex. "A." It does not appear from the security video that any blood is plainly visible on Plaintiff's jumpsuit.

### 2.  *Life in Linear A*

Upon arriving at her new cell, Plaintiff's bedding was taken away from her. It was returned at 12:38 a.m. the following day, depriving her of bedding for a total of approximately nine hours. *See* Dkt. No. 68-3, Defs.' Ex. "B", at 15. Plaintiff testified that she had to sleep on a concrete slab and that she was "freezing." *See* Dkt. No. 71-4, Pl.'s Dep., at 53:3-11, 64:14.

Defendant CO Haskell testified that it was the Facility's practice to take away an inmate's bedding when the inmate was being disruptive or when the inmate was misusing the mattress. *See* Dkt. No. 71-7, Haskell Dep., at 21:25-26:5.

Plaintiff testified that, beginning with her initial request for medical attention on Friday afternoon, she was repeatedly denied medical attention until Sunday afternoon. *See* Dkt. No. 71-2, Pl.'s 50-h Dep., at 58:8-16. When she did see the medical staff, Plaintiff told the attending nurse that her level of pain was "nothing serious." *See* Dkt. No. 71-18, Pl.'s Response to Statement of Material Facts, at ¶ 127. The medical chart says that Plaintiff was complaining of heavy bleeding and pain at this time. *See* Dkt. No. 68-7, Defs.' Ex. "F", at 7. Moreover, it is undisputed that Plaintiff was not given her prescription medication at any time. *See* Dkt. No. 71-18, Pl.'s Response to Statement of Material Facts, at ¶¶ 157, 159.

Plaintiff further testified that, beginning Friday afternoon and for approximately the next 48 hours, she was repeatedly denied a change of clothing, a shower, and sanitary napkins. *See* Dkt. No. 71-2, Pl.'s 50-h Dep., at 58:8-16. According to Plaintiff, she asked for these things from every staff member with whom she spoke, including both COs and nurses. *See id.* During this time, Plaintiff alleges, she was forced to subsist in her blood-stained jumpsuit with no means of cleaning herself up. *See id.* at 56:11-14.

### 3. *Aftermath*

Plaintiff testified that she was diagnosed with Post Traumatic Stress Disorder in connection with the events outlined above. *See* Dkt. No. 71-3, Pl.'s Dep. at 43:3-17. When Plaintiff visited a doctor three to four days after her release from the Facility, she was advised that her vaginal bleeding was normal. *See* Dkt. No. 68-25, Defs.' Statement of Material Facts, at

¶ 142; Dkt. No. 71-2, Pl.'s 50-h Dep., at 70:16-20 (bleeding was "something normal. It was nothing serious.").

## B. Third-party complaint

Defendants filed a third-party complaint pursuant to, among other provisions, the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680, against the United States and the U.S. Department of Health and Human Services, seeking indemnity or contribution in connection with the conduct of the Facility's medical staff. *See generally* Dkt. No. 47, Third-Party Complaint. In particular, Third-Party Plaintiffs allege that any liability they face in connection with Plaintiff's claims are "solely due to the conduct" of medical staff at the Facility, who were employees of the federally-funded Hudson Headwaters Health Network ("Hudson Headwaters"). *See* Dkt. No. 47, Third-Party Complaint, at ¶ 34. In other words, because Defendants "contend that they are not in any way legally responsible" in this case, they seek indemnification to the extent that Plaintiff's damages were attributable to the medical staff's failure to provide medical care. *See id.* at ¶ 37.

Third-Party Plaintiffs advance two other claims. First, they bring a claim for breach of contract, alleging that Hudson Headwaters breached its contract with Defendant County by failing to provide adequate medical treatment to Plaintiff. *See* Dkt. No. 47, Third-Party Compl., at ¶ 43. Second, Third-Party Plaintiffs bring a claim for negligence, alleging that Hudson Headwaters breached its duty of care to provide Plaintiff with reasonable medical care. *See id.* at 51.

# III. DISCUSSION

## A. Summary judgment standard of review

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a genuine issue of material fact exists, courts must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986) (citation omitted). In addition, "[the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate the absence of any genuine issue of material fact." *Celotex v. Catrett,* 477 U.S. 317, 323 (1986). However, when the moving party has met this initial responsibility, the nonmoving party must come forward with specific facts showing a genuine issue of material fact for trial. *See* Fed. R. Civ. P. 56(a), (c), (e).

A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir. 1998) (citation omitted). As the Supreme Court has explained, "[the nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (citations omitted).

As for the materiality requirement, a dispute of fact is material if it "might affect the outcome of the suit under the governing law[.]" *Anderson,* 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citation omitted).

**B. Plaintiff's federal claims[1]**

### 1. Eighth Amendment excessive force claims

The Eighth Amendment prohibits punishments involving the "'unnecessary and wanton infliction of pain'" that are incompatible with "'the evolving standards of decency that mark the progress of a maturing society.'" *Estelle v. Gamble,* 429 U.S. 97, 102, 104 (1976) (quotations and other citations omitted). Analysis of cruel and unusual punishment claims requires both objective examination of the conduct's effect and a subjective inquiry into the defendant's motive for his or her conduct. *See Wright v. Goord,* 554 F.3d 255, 268 (2d Cir. 2009) (citing *Hudson v. McMillian,* 503 U.S. 1, 7–8, 112 S. Ct. 995, 117 L. Ed. 2d 152 (1992)) (other citation omitted).

After *Hudson*, the "'core judicial inquiry'" is focused not upon the extent of the injury sustained but instead whether the nature of the force applied was nontrivial. *Green v. McLaughlin,* 480 F. App'x 44, 48 (2d Cir. 2012) (quoting *Hudson v. McMillan*, 503 U.S. 1, 7, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992)) ("For excessive force claims, the core judicial inquiry is . . . whether force was applied . . . maliciously or sadistically to cause harm."). Accordingly, the absence of serious injury, although relevant, does not necessarily negate a finding of wantonness because

> [w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated. . . . This is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.

*Hudson,* 503 U.S. at 9 (internal citation omitted).

---

[1] As an initial matter, the Court notes that Plaintiff was not obligated to exhaust her administrative remedies under 42 U.S.C. § 1997e(a) before filing suit because she was no longer a prisoner when she commenced this action. *See Greig v. Goord*, 169 F.3d 165, 167 (2d Cir. 1999) (holding that "litigants . . . who file prison condition actions after release from confinement . . . need not satisfy the exhaustion requirements . . . .").

Put another way, the extent of an inmate's injury is but one of the factors a court should consider in determining whether a prison official's use of force was "unnecessary and wanton"; courts should also consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *See Whitley v. Albers*, 475 U.S. 312, 321 (1986).

With its focus on the harm done, the objective prong of the inquiry is contextual and relies upon "'contemporary standards of decency.'" *Wright*, 554 F.3d at 268 (quoting *Hudson*, 503 U.S. at 8, 112 S. Ct. 995). With respect to an allegation of overly-tight handcuffs, "'a [c]ourt is to consider evidence that: 1) the handcuffs were unreasonably tight; 2) the defendants ignored the [plaintiff's] pleas that the handcuffs were too tight; and 3) the degree of *injury to the wrists*." *Finley v. Perry*, No. 9:06-CV-1524, 2010 WL 6427496, *7 (N.D.N.Y. July 13, 2010), *rept. & rec. adopted*, 2011 WL 1302248 (N.D.N.Y. Mar. 31, 2011) (quotation omitted).

In this case, Defendants' first argument, namely, that Plaintiff's injuries were insufficient to rise to the level of a constitutional violation, is without support in the law. Although the *Hudson* Court noted that "[t]he Eighth Amendment . . . necessarily excludes . . . *de minimis* uses of physical force," it held that a use of force resulting in bruises, swelling, and loosened teeth could rise to the level of a constitutional violation. 503 U.S. at 9-10. By way of comparison, in this case, Plaintiff has produced evidence of bruises and lacerations to her wrists and the side of her torso, as well as a chipped tooth. This is sufficient to raise a genuine issue of material fact. *See Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003) (reversing summary dismissal of prisoner's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the "medical records after the . . . incident with [that

officer] indicated only a slight injury"); *Cicio v. Lamora*, No. 9:08-CV-431, 2010 WL 1063875, *2, *7 (N.D.N.Y. Feb. 24, 2010), *rept. & rec. adopted*, 2010 WL 1063864 (N.D.N.Y. Mar. 22, 2010) (denying summary judgment where photographs of the plaintiff's injuries showed only minor bruising).

With respect to the other factors of the subjective element, namely, the need for force, whether the force was proportionate to the need, the threat that the officials reasonably perceived, and what, if anything, the officials did to limit their use of force, the circumstances set the stage for allowing a jury to determine whether Defendant COs' use of force was malicious and sadistic. In particular, the fact that five male COs transported Plaintiff, a female, goes to the factor of what threat the officials perceived. In addition, the fact that there appears to be no dispute that Plaintiff was not resisting during the transfer goes to the factors of what need there was for force and whether such force was proportional to the need. Viewed together, these facts present genuine disputes of material fact as to whether Defendant COs' use of force against Plaintiff was malicious and sadistic.

Additionally, Defendants' related arguments that the Court should disregard Plaintiff's testimony because of the security video footage and because she lacks credibility fall short in two respects. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (finding that summary judgment was appropriate where police video contradicted plaintiff's account of high-speed chase); *McKinney v. Dzurenda*, 555 F. App'x 110, 111-12 (2d Cir. 2014) (holding that the district court properly disregarded plaintiff prisoner's account of events where video clearly showed correction officers using force only

after plaintiff "assumed a boxing stance and made clear his willingness to fight").  In this case, the allegations giving rise to the substance of Plaintiff's excessive force claims transpired out of the cameras' view and thus are not "blatantly contradicted" by the security video footage.  *See Scott*, 550 U.S. at 380.

Moreover, although a plaintiff's story "need not be literally impossible for a court to reject it" at summary judgment,  *Moore v. Casselberry*, 584 F. Supp. 2d 580, 585, 588 (W.D.N.Y. 2008) (citations omitted), before a court may properly do so, the law of this Circuit requires the moving party to show that there is *no evidence* in the record upon which a reasonable jury could find in the plaintiff's favor.  *See Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005).  In this case nearly all the contradictions Defendants raise with respect to the video go largely to collateral matters—for example, that Plaintiff testified to her transfer lasting five-to-ten minutes when the video shows it lasting three.  Such contradictions do not render Plaintiff's testimony objectively unbelievable.

For these reasons, the Court denies Defendants' motion with respect to Plaintiff's Eighth Amendment excessive force claims.


### 2.  *Eighth Amendment deliberate medical indifference claims*

The Eight Amendment's prohibition against cruel and unusual punishment applies to prison officials providing medical care to inmates.  *See Estelle v. Gamble*, 429 U.S. 97, 103 (1976); *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (citation omitted).  In order to survive summary judgment on a claim for denial of medical treatment, a plaintiff must "allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  *Estelle*, 429 U.S. at 106.  This analysis embodies both an objective and subjective prong.

*See Lasher v. City of Schenectady*, No. 02-CV-1395, 2004 WL 1732006, *4 (N.D.N.Y. Aug. 3, 2004) (citing *Hathaway*, 37 F.3d at 66).  The injury must be "sufficiently serious" in objective terms, and the charged official must act with a sufficiently culpable state of mind.  *See id.* (citation omitted).

Deliberate indifference is a subjective standard requiring a plaintiff to demonstrate that the defendant acted with the requisite culpable mental state "'equivalent to subjective recklessness.'"  *Nielsen v. Rabin*, 746 F.3d 58, 63 (2d Cir. 2014) (quotation omitted).  To demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm requires "something more than mere negligence . . . [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result."  *Farmer v. Brennan,* 511 U.S. 825, 835 (1994); *see also Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir. 1996) (quoting [*Farmer*, 511 U.S.] at ___, 114 S. Ct. at 1978) (other citation omitted).  In other words, "'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'"  *Hathaway*, 37 F.3d at 66 (quoting [*Farmer*, 511 U.S.] at ___, 114 S. Ct. at 1979).

In this case, Plaintiff alleges that, beginning on Friday afternoon, she repeatedly told every Facility staff member she encountered that she needed medical attention and requested to be seen.  However, she testified that all of these requests were ignored until Sunday afternoon, the second full day after she discovered she was bleeding.  Moreover, Plaintiff testified that Defendant CO Graham offered her a form with which to request medical attention but that he refused to provide her a pen with which to complete the form.

These facts, viewed in isolation, reasonably could be interpreted as suggesting that Defendant COs, and Defendant CO Graham in particular, acted with deliberate indifference to

Plaintiff's medical issue. However, viewing the record as a whole, it is clear that Defendants could not have been aware of circumstances from which they could have inferred that a serious risk of harm existed. Plaintiff failed to notify Facility staff that she had recently undergone an abortion. Further, there is no evidence in the record tending to show that Defendants were aware of blood on Plaintiff's clothing. For example, the Facility's security video footage, taken after Plaintiff awoke to find that she was bleeding, shows no discernible trace of blood on Plaintiff's clothing. In other words, even assuming that Plaintiff had a serious medical condition, no reasonable factfinder could conclude based on this record that Defendant COs were "aware of facts from which the inference could be drawn that a substantial risk of serious harm" existed with respect to Plaintiff's health, *Hathaway*, 37 F.3d at 66, or that Defendant COs were more than merely negligent, *see Farmer*, 511 U.S. at 835. For these reasons, the Court grants Defendants' motion for summary judgment with respect to Plaintiff's Eighth Amendment deliberate medical indifference claims.

### 3. *Eighth Amendment conditions of confinement claims*

To state an Eighth Amendment claim based on conditions of confinement, an inmate must allege that: (1) objectively, the deprivation the inmate suffered was "sufficiently serious that [s]he was denied the minimal civilized measure of life's necessities," and (2) subjectively, the defendant official acted with "a sufficiently culpable state of mind . . ., such as deliberate indifference to inmate health or safety." . . .

*Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (internal quotation omitted). The subjective element of these claims is the same as for Plaintiff's medical needs claims. *See id.*

With respect to the objective element, the inmate must show that the conditions, either alone or in combination, posed an unreasonable risk of serious damage to her health. *See Rhodes v. Chapman,* 452 U.S. 337, 346-47 (1981); *Phelps v. Kapnolas,* 308 F.3d 180, 185-86 (2d Cir.

2002) (*per curiam*).  Thus, prison officials violate the Eighth Amendment when they deprive an inmate of "basic human needs" such as food, clothing, medical care, and safe and sanitary living conditions.  *See Phelps*, 308 F.3d at 185 (quotation omitted).  "[T]here is no 'static test' to determine whether a deprivation is sufficiently serious; '[t]he conditions themselves must be evaluated in light of contemporary standards of decency.'"  *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012) (quotation omitted).

Failure to provide prisoners with toiletries and other hygienic materials may rise to the level of a constitutional violation.  *See Trammell v. Keane*, 338 F.3d 155, 165 (2d Cir. 2003) (citations omitted).  Notwithstanding, the courts of this Circuit have set a high bar for surviving summary judgment on such a claim.  *See, e.g.*, *McNatt v. Unit Manager Parker*, No. 3:99CV1397, 2000 WL 307000, *4 (D. Conn. Jan. 18, 2000) (finding no Eighth Amendment violation when inmates endured "stained, smelly mattresses; unclean cell; no bedding for six days; no cleaning supplies for six days; no toilet paper for one day; no toiletries or clothing for six days; no shower shoes; dirty showers; cold water that did not function properly; and smaller food portions") (cited in *Gill v. Hoadley*, 261 F. Supp. 2d 113, 129 (N.D.N.Y. 2003)).  In this case, Plaintiff went without toilet paper for approximately 48 hours, was denied a change of clothes for two days, was denied the use of sanitary napkins, and had no access to a shower or a towel.  These circumstances, viewed together, do not objectively rise to the level of an unreasonable risk of serious damage to Plaintiff's health.  For this reason, the Court grants Defendants' motion with respect to Plaintiff's Eighth Amendment conditions of confinement claims.

### 4. Municipal liability based on unconstitutional customs or policies[2]

In order to impose Section 1983 liability against a municipal defendant, a plaintiff must set forth facts that demonstrate the alleged constitutional violation resulted from an official policy, custom, or practice. *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694-95 (1978). A plaintiff must show "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris,* 489 U.S. 378, 385 (1989). The existence of a policy or custom can be inferred from "circumstantial proof, such as evidence that the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction." *Ricciuti v. N.Y.C. Transit Auth.,* 941 F.2d 119, 123 (2d Cir. 1991) (citation omitted). To establish deliberate indifference within the context of failure to train municipal employees, a plaintiff must show that

> (i) a policymaker knows "to a moral certainty" that [municipal] employees will confront a particular situation; (ii) the situation either presents the employee with "a difficult choice of the sort that training or supervision will make less difficult" or "there is a history of employees mishandling the situation;" and (3) "the wrong choice by the [municipal] employee will frequently cause the deprivation of a citizen's constitutional rights." . . .

*Wray v. City of New York*, 490 F.3d 189, 195-96 (2d Cir. 2007) (internal quotation omitted).

Defendant County of Warren's Inspection and Supervision Policy requires "[a]n officer of the same sex [to] be present when physical force is to be used, except in emergency situations." *See* Dkt. No. 68-15, Defs.' Ex. N, at 17. All but one of Defendant COs testified that they were not aware of this requirement. However there is no genuine issue of material fact as to deliberate indifference. In this case, there is no evidence in the record tending to suggest that

---

[2] In this case, since there is no constitutional violation with respect to Defendants depriving Plaintiff of a mattress for approximately nine hours, the Court does not reach the question of whether any policy with respect to removing inmates' mattresses caused a constitutional violation. Accordingly, the Court addresses this question only with respect to Defendant County of Warren's Inspection and Supervision Policy.

there is a history of Facility COs using excessive force in cross-gender situations. Additionally, there is no evidence in the record from which a reasonable jury could conclude that training COs with respect to having a female CO present during the use of force against a female inmate would reduce the difficulty of choosing how much force to use. *See Wray*, 490 F.3d at 195-96. For these reasons, the Court grants Defendants' motion with respect to Plaintiff's municipal liability claims.

### C. Plaintiff's state-law claims

As a preliminary matter, although New York Correction Law Section 24 bars inmates from suing New York Department of Corrections and Community Supervision ("DOCCS") employees in their individual capacities in state court for torts arising from acts done in the scope of employment, *see* N.Y. Corr. Law § 24, this provision does not apply here. In this case, Defendant COs were employees of Defendant County of Warren at the time in question. Because its plain language makes clear that it grants immunity only to employees of "the department," referring to DOCCS, s*ee* N.Y. Corr. Law § 2, New York Correction Law Section 24 does not immunize the CO Defendants from defending Plaintiff's state-law claims.

#### 1. Assault and battery claims

"'[E]xcept for § 1983's requirement that the tort be committed under color of state law, the essential elements of [excessive force and state-law assault and battery claims are] substantially identical.'" *Humphrey v. Landers*, 344 F. App'x 686, 688 (2d Cir. 2009) (quotation omitted). For this reason, genuine issues of material fact with respect to an excessive force claim translate to assault and battery claims arising from the same facts, rendering summary judgment

inappropriate.  *See Hattar v. Carelli*, No. 09 CV 4642, 2012 WL 246668, *4 (S.D.N.Y. Jan. 11, 2012) (citations omitted).  In this case, because genuine issues of material fact exist with respect to Plaintiff's excessive force claims, the Court denies Defendants' motion with respect to Plaintiff's assault and battery claims.

### 2.  *Intentional infliction of emotional distress ("IIED") claims*

"In New York, 'intentional infliction of emotional distress is a theory of recovery that is to be invoked only as a last resort,' when traditional tort remedies are unavailable." *Naccarato v. Scarselli*, 124 F. Supp. 2d 36, 44 (N.D.N.Y. 2000) (citing *EEOC v. Die Fliedermaus, L.L.C.*, 77 F. Supp. 2d 460, 472 (S.D.N.Y. 1999) (quoting *McIntyre v. Manhattan Ford, Lincoln-Mercury, Inc.,* 256 A.D.2d 269, 682 N.Y.S.2d 167, 169 (1st Dep't 1998))).  Accordingly, "'[n]o intentional infliction of emotional distress claim will lie where the conduct underlying the claim falls within the ambit of traditional tort liability.'" *Id.* (quoting *Hansel v. Sheridan,* 991 F. Supp. 69, 75 (N.D.N.Y. 1998)).  In this case, Plaintiff's IIED claims concern the same conduct as her excessive force claims and her assault and battery claims.  For this reason, Plaintiff may not properly bring her IIED claims in addition to her excessive force and assault and battery claims.  Accordingly, the Court grants Defendants' motion with respect to Plaintiff's claims for intentional infliction of emotional distress.

### 3.  *Defendant County's vicarious liability*

An employer may be liable for the tortious acts of its employees when those acts occur within the scope of the employment.  *See Riviello v. Waldron*, 47 N.Y.2d 297, 302 (1979) (citations omitted).  When a court denies summary judgment with respect to assault and battery

claims against law enforcement officers, the court must also deny summary judgment with respect to related *respondeat superior* claims. *See Pravda v. City of Albany*, 956 F. Supp. 174, 183 (N.D.N.Y. 1997).

As noted, there exist genuine issues of material fact with respect to Plaintiff's assault and battery claims. In addition, there is no dispute that Defendant COs were employees of Defendant County of Warren or that they were acting within the scope of their employment. For these reasons, the Court denies Defendants' motion with respect to Plaintiff's *respondeat superior* claim against Defendant County of Warren.

### 4. Defendant County of Warren's negligence

Government entities may be sued in negligence for breaching their duty to protect the health and safety of inmates in their custody. *See Sanchez v. State of New York*, 99 N.Y.2d 247, 252 (2002) (citations and footnote omitted). As with any negligence claim, this duty is limited to reasonably foreseeable risks of harm. *See id.* Under New York law, the elements of a negligence claim are (1) a duty owed to the plaintiff by the defendant, (2) a breach of that duty, and (3) injury substantially caused by that breach. *See Robinson v. U.S. Bureau of Prisons*, 244 F. Supp. 2d 57, 64-65 (2d Cir. 2003) (citation omitted).

"When a plaintiff brings excessive force and assault claims which are premised upon a defendant's allegedly intentional conduct, a negligence claim with respect to the same conduct will not lie." *Naccarato*, 124 F. Supp. 2d at 45 (citations omitted). Accordingly, Plaintiff may not properly bring a negligence claim with respect to the same facts from which her excessive force and assault and battery claims arise. With respect to the remainder of Plaintiff's negligence claim, namely, the deprivation of hygienic items and medical care, there is no evidence in the

record upon which a reasonable jury could conclude that such deprivation substantially caused any injury. Accordingly, the Court grants Defendants' motion with respect to Plaintiff's negligence claim in its entirety.

### D. Qualified Immunity[3]

The doctrine of qualified immunity "'protects federal and state officials from . . . unnecessary and burdensome discovery or trial proceedings.'" *Raspardo v. Carlone*, 770 F.3d 97, 111 (2d Cir. 2014) (quotation omitted). Law enforcement officers are entitled to qualified immunity if (1) their conduct does not violate clearly established constitutional rights; or (2) it was objectively reasonable for them to believe that their acts did not violate those rights. *See id.* at 113 (quotation and other citation omitted). Although this inquiry requires a focus on the particular facts of the case, the Second Circuit has held that a defendant is entitled to summary judgment on qualified immunity grounds only when

> "no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiff[], could conclude that it was objectively unreasonable for the defendant[s]" to believe that [they were] acting in a fashion that did not clearly violate an established federally protected right. . . .

*Robison v. Via,* 821 F.2d 913, 921 (2d Cir.1987) (internal quotation omitted).

"Because analysis of the defense of qualified immunity is not 'merely duplicative' of a court's determination of an excessive force claim, early and particularized resolution of the former is required." *Swift v. Mauro*, No. 5:04-CV-0899, 2008 WL 207793, *4 (N.D.N.Y. Jan. 24, 2008) (quotation omitted). Indeed, denying a motion for summary judgment with respect to an excessive force claim does not translate into a *per se* denial of the qualified immunity defense.

---

[3] Since the Court grants Defendants' motion for summary judgment with respect to most of Plaintiff's constitutional claims, the Court need only address whether Defendant COs are entitled to qualified immunity with respect to Plaintiff's Eight Amendment excessive force claims.

*See Henry v. Dinelle*, 929 F. Supp. 2d 107, 128 (N.D.N.Y. 2013).  However courts have denied such motions on facts similar to those at issue in this case.  *See Cicio*, 2010 WL 1063875, at *7.

In this case, there is no question that the constitutional claims concern clearly established rights.  Moreover, no reasonable corrections officer would question that it is a constitutional violation to shove an inmate face-first into the floor, kick her in the side, and pull back on her wrists by the handcuffs, breaking the skin—especially when she is not resisting.  For these reasons, the Court denies Defendants' motion with respect to qualified immunity as it relates to Plaintiff's excessive force claims.


### E.  Third-party complaint

A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists.  *See Malik v. Meissner*, 82 F.3d 560, 562 (2d Cir. 1996) (quotation omitted).  The court may look beyond the pleadings to other evidence in the record to determine the question of subject matter jurisdiction.  *See Robinson v. Gov't of Malaysia*, 269 F.3d 133, 140 n.6 (2d Cir. 2001).

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."  *FDIC v. Meyer*, 510 U.S. 471, 475 (1994) (citations omitted).  Accordingly, the Government may only be sued with its consent.  *See United States v. Mitchell*, 445 U.S. 535, 538 (1980) (quotation omitted).  The terms of such waiver "'define [the] court's jurisdiction to entertain the suit.'"  *Id.* (quotation omitted)  The Government's waiver of sovereign immunity must be unequivocally expressed and strictly construed.  *See United States v. King*, 395 U.S. 1, 4 (1969) (citation omitted); *United States v. Sherwood*, 312 U.S. 584, 590 (1941).

The FTCA's waiver of sovereign immunity does not extend to alleged constitutional violations. *See Paulino-Duarte v. United States*, No. 02 Civ. 9499, 2003 WL 22533401, *3 (S.D.N.Y. Nov. 7, 2003). In this case, the Government enjoys sovereign immunity, and accordingly the Court lacks subject matter jurisdiction to the extent that the third-party claims are based upon alleged constitutional violations. Moreover, to the extent that the third-party claims sound in breach of contract, these claims are dismissed as moot because Plaintiff's medical care is no longer at issue in this case. For these reasons, the Court dismisses the third-party complaint in its entirety.

## IV. CONCLUSION

Having reviewed the entire record in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion for summary judgment is **GRANTED** with respect to Plaintiff's Eighth Amendment medical indifference claims, Eighth Amendment conditions of confinement claims; municipal liability claims; intentional infliction of emotional distress claims; and negligence claims; and the Court further

**ORDERS** that Defendants' motion for summary judgment is **DENIED** with respect to all other claims[4]; and the Court further

**ORDERS** that Third-Party Defendants' motion to dismiss the third-party complaint is **GRANTED**; and the Court further

---

[4] As a result of this Memorandum-Decision and Order, the following claims remain for trial: (1) Plaintiff's Eighth Amendment excessive force claims against Defendant COs; (2) Plaintiff's state-law assault and battery claims against Defendant COs; and (3) Plaintiff's *respondeat superior* claim against Defendant County of Warren as it relates to Plaintiff's assault and battery claims against Defendant COs.

**ORDERS** that trial counsel shall participate in a telephone conference on **December 15, 2015**, at **10:00 a.m.** to schedule a trial in this matter. The Court will provide counsel with the dial-in instructions prior to the conference.

**IT IS SO ORDERED.**

Dated: December 1, 2015
    Syracuse, New York


Frederick J. Scullin, Jr.
Senior United States District Judge